Robert WADE, Plaintiff,

v.

Bernard F. BRADY, Thomas F. Reilly, and Timothy J. Cruz, Defendants.

Civil Action No. 04cv12135–NG.

United States District Court, D. Massachusetts.

April 30, 2009.

Janet H. Pumphrey, Lenox, MA, for Plaintiff.

Randall E. Ravitz, Eva M. Badway, Office of the Attorney General, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

GERTNER, District Judge:

## I. INTRODUCTION

Robert Wade ("Wade") brings this action under 42 U.S.C. § 1983 to vindicate

his due process right to access certain biological evidence post-conviction. He aims to subject that evidence to DNA testing and use the results, which he believes will be exculpatory, to challenge his felony murder conviction. In 2006, I held that there was a Due Process right to post-conviction access to biological evidence under certain circumstances and that Wade had properly stated a claim. I said:

> DNA testing is different. Because DNA testing can exonerate the defendant, the government may only legitimately deny access to testing if it has a compelling reason to do so. To hold otherwise would subordinate the pursuit of justice to an arid obsession with procedure. Where DNA evidence can prove that a miscarriage of justice was perpetrated by an earlier verdict, our interest in fundamental fairness and the integrity of the criminal justice system require that DNA testing be allowed. Because I find that a Due Process right to DNA testing does exist, I hereby deny defendants' motion to dismiss.

*Wade v. Brady*, 460 F.Supp.2d 226, 231 (D.Mass.2006) ("2006 Order").

At the time, I left open key questions about the accrual of the statute of limitations, the legal standard for when testing must be ordered, and whether Wade can meet that legal standard. As both Wade and the defendants have moved for summary judgment, I now resolve those issues.

As explained below, the most sensible approach to the statute of limitations is to view the first denial of a request for access to evidence—whether by the prosecutor or the court—as the triggering date for accrual. Here, prosecutors refused to turn over the relevant evidence without a court order; the superior court then denied Wade's first motion for access on July 29, 2003. His § 1983 complaint (dated October 11, 2005) relates back to his habeas petition (dated October 8, 2004), which was filed well before the expiration of the applicable three-year limitations period. Thus, this action is timely.

As to the nature of the legal standard, confronted with untenable suggestions from both sides—Wade's proposal too permissive, the defendants' virtually prohibitive—I adopt a middle course followed by other courts: The due process right attaches when there is a reasonable probability that DNA testing would, if favorable, allow the prisoner to prevail in an action for post-conviction relief. Applying this standard to the instant case, I **GRANT** summary judgment for Wade.

I emphasize that the result in this case is somewhat anomalous because of the way in which Wade was charged. While the circumstantial evidence suggests Wade may have been involved in some sort of attack on the victim, the grand jury indicted and a jury convicted on the theory of felony murder with a predicate offense of rape. Wade seeks to conduct DNA testing of forensic evidence collected from the victim in an effort to cast doubt on the rape theory and in so doing, undermine the felony murder conviction. Where testing could have such a profound impact on the basis for a prisoner's confinement, Due Process—let alone the minimal requirement of fairness—requires that it be granted.

## II. FACTS

With an IQ of 72, Wade is borderline mentally retarded. In 1993, he worked as a farmhand in Lakeville, Massachusetts, and lived in a small cabin on his employer's property. The employer also lived on the property and shared his residence with his 83-year-old mother, who suffered from an advanced form of Alzheimer's Disease.

On October 24, 1993, the employer discovered his mother in Wade's cabin bed-

room, naked, beaten, and barely conscious. Wade, also naked, was in the bedroom with her. According to the employer, Wade said by way of explanation, "she came to me." The mother had suffered a fractured wrist and hip, a scratch above her eye, red marks around her neck consistent with choking, and abrasions on her hands, shoulders, knees, and buttocks.[1] Her clothes were soiled with dirt, and the back of her brassiere was torn. The employer left the cabin for a period of time; as he departed, he heard Wade say to the mother, "see all the trouble you got me into." Wade then helped the employer retrieve a wheelchair from elsewhere on the property, which they used to move the victim to the main house before calling the police.

Two days later, the victim received hip replacement surgery. Four days after she was initially brought to the hospital, she developed respiratory problems that led to pneumonia. Although her condition improved for a short period, she died on November 13, 1993. An officer later testified that when he asked her in the hospital "who did this to you?" she answered "it was the man out back ... Bob."

Law enforcement authorities took a vaginal swab and smear, both of which revealed the presence of semen, and collected fingernail scrapings as part of the rape kit. A forensic pathologist later testified that Wade could not be excluded as the source of that semen. Authorities also obtained a semen and blood-stained cutting from the crotch of the woman's pants. Serology tests revealed the presence of H and A antigens on that section of clothing. Both Wade and the victim were type-O blood secretors, whose blood yields only H antigens when serologically tested. The presence of A antigens therefore suggest-

ed the involvement of a third party. At trial, Wade's statement, "I could not get a hard on.... Nothing happened," was admitted. In addition, Wade's psychologist testified at a state post-conviction hearing that Wade reported consuming three bottles of wine and eighteen beers the day of the incident, as evidence that he had been unable to perform sexually.

No DNA testing was performed on any of the samples taken from the victim. Wade has consistently maintained his innocence and insists that he never harmed the victim, despite being found in his cabin with her.

## III. *PROCEDURAL HISTORY*

Wade was indicted on one count of aggravated rape, Mass. Gen. Laws. ch. 265, § 22, and one count of first degree murder, *id.* § 1, on December 6, 1993. During the trial, the Commonwealth presented serology evidence that could not exclude, but also could not definitively identify, Wade as the attacker. Trial counsel never sought DNA testing of this evidence before or during the trial. DNA test results had become admissible in Massachusetts state courts only one week prior to the beginning of Wade's trial. *See Commonwealth v. Rosier*, 425 Mass. 807, 685 N.E.2d 739 (1997). Instead, counsel elected to argue the defense of consent. The jury convicted Wade of aggravated rape and felony murder on September 8, 1997. He was sentenced to life imprisonment.

Wade filed notice of appeal on September 24, 1997, and retained new counsel. The Supreme Judicial Court ("SJC") affirmed his felony murder conviction, but vacated his conviction for the underlying predicate of aggravated rape as duplicative. *See Commonwealth v. Wade*, 428

---

1. Some of these injuries were observed by the employer upon entering the bedroom; others were discovered later by medical personnel.

Mass. 147, 155, 697 N.E.2d 541 (1998). Wade filed a petition for post-conviction relief on May 9, 2000, which was denied by the superior court on May 23, 2000.

On August 21, 2002, Wade retained yet another lawyer, who filed a motion in superior court for preservation of evidence. The court granted the motion on October 31, 2002. On December 9, 2002, Wade moved for DNA testing of the preserved physical evidence. He filed a motion for new trial based on ineffective assistance of counsel three weeks later. After a hearing, the superior court denied Wade's motion for DNA testing on July 29, 2003, concluding that his new argument of total innocence was at odds with his trial theory, the defense of consent. On August 13, 2003, Wade filed a motion for reconsideration, which was denied, as was his motion for new trial. A single justice of the Supreme Judicial Court then rejected Wade's petition for leave to appeal those decisions, without comment, on April 12, 2004.

On October 8, 2004, Wade filed a habeas petition before this Court, claiming ineffective assistance of counsel, which the defendants moved to dismiss. Wade next filed a motion to amend his habeas complaint on May 13, 2005. I granted the government's motion to dismiss the habeas petition on September 26, 2005, finding that Wade's ineffective assistance of counsel claim was procedurally defaulted because Wade had not shown "actual innocence" to overcome this default. At the same time, I granted Wade's motion to amend the complaint to raise a due process claim under § 1983, which Wade did on October 11, 2005. On October 27, 2006, I denied the defendants' motion to dismiss based on my finding that there exists a due process right to access evidence post-conviction for DNA testing where "DNA evidence can prove that a miscarriage of justice was perpetrated by an earlier verdict." *See Wade v. Brady*, 460 F.Supp.2d at 231.

## IV. *DISCUSSION*

Both parties have now moved for summary judgment. Resolution of these motions depends on whether Wade has standing to bring this suit, whether his § 1983 claim was timely filed, the legal standard for when the due process right attaches, and whether Wade meets that standard. I address each question in turn.

### A. *Standing*

■ In order for a plaintiff to bring suit in federal court, he must establish three elements: (1) injury in fact; (2) causation; and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To establish injury in fact, a plaintiff must show that the actions or inactions of the defendant constituted an invasion of one of plaintiff's legally protected interests. *Id.* This interest must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* Additionally, the causation prong requires that the injury be traced to the alleged action or inaction of the defendants, rather than the actions of a third party. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Finally, the plaintiff must show that he can obtain relief for his injury through his suit. *Allen v. Wright*, 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Daimler-Chrysler Corp. v. Cuno*, 547 U.S. 332, 342, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006).

The defendants argue that Wade is unable to fulfill these requirements and thus lacks standing to sustain the instant suit. As to injury, they suggest there are only three possibilities underlying Wade's claim: (1) that not being able to conduct DNA testing is itself an injury, (2) that lacking access to the evidence impaired Wade's ability to meaningfully access the courts, and (3) that keeping the evidence

from him resulted in his continued confinement. Each of these, they argue, is entirely speculative because each depends on the DNA testing producing truly exculpatory results. At this point—pre-testing—it is not clear that Wade is missing anything of value by lacking test results; he cannot establish any actual hindrance in accessing the court system without the knowledge that the DNA would win him a new trial; and his continued confinement is inevitable on the current state of the evidence.

In support of their standing challenge, the defendants invoke language from my dismissal opinion. I held that while *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), prohibited prisoners from bringing through § 1983 claims that would necessarily imply the unlawfulness of their convictions, the relief Wade sought would "allow[ ] nothing more than access to evidence that *may* prove to be exculpatory and which *may,* if exculpatory, permit petitioner to obtain his release through a separate action." *Wade,* 460 F.Supp.2d at 239. As such, the defendants argue:

> If it is such a matter of conjecture whether the Plaintiff would have grounds for and be able to bring a non-frivolous challenge to his conviction if he had access to the DNA evidence, then it cannot be said that his injury in lacking such access is "concrete and ... actual or imminent,' as opposed to 'conjectural or hypothetical."

Def.'s Opp. Mem. at 7 (document # 66) (quoting *Donahue v. City of Boston,* 304 F.3d at 115). For the same reasons, they contend, any injury is not fairly traceable to the defendants' conduct and not likely to be redressed by any relief a court could provide.

■ To some extent, these arguments go to the substantive legal question the cross-motions require me to decide. That is, to ask whether Wade has a cognizable injury fairly traceable to the defendants' conduct and redressable by court order is to ask whether Wade can meet the appropriate legal standard for when a due process right to access evidence for DNA testing attaches. I need not fast-forward to that analysis, however, to conclude that the defendants' arguments are badly off the mark. For the purposes of standing, the issue is not the ultimate value of the testing (which, of course, remains a mystery unless and until access is granted), but rather the *opportunity* to conduct it at all. *See Wade,* 460 F.Supp.2d at 236 n. 19. Wade's statement of his injury echoes this understanding. He identifies "(1) an inability to adequately determine whether his original conviction is in fact worthy of confidence and in accordance with the Federal Constitution; and (2) an inability to adequately develop the key facts that would form the basis of his constitutional claims for redress." Pl.'s Opp. Mem. at 11 (document # 67). Wade's injury-in-fact is the deprivation of the constitutional right of access itself.

With this understanding, the other two standing requirements are easily met. There is no question that Wade's injury—his inability to access biological evidence for DNA testing—was caused by the defendants' denial of his request. Nor is there any doubt that it can be remedied in full by a court order requiring the government to make that evidence available to him.[2] In sum, Wade meets all three re-

---

2. The defendants' argument against redressability would be persuasive if Wade's purported injury were wrongful conviction, as relief from confinement is not available under § 1983. *Heck,* 512 U.S. at 487 n. 7, 114 S.Ct. 2364. But because the injury Wade seeks to remedy is lack of access to forensic evidence currently in the state's possession, he can receive all the relief he seeks through this claim.

quirements to establish standing in this case.

## B. *Statute of Limitations*

In my 2006 Order, I held that the appropriate statute of limitations for the plaintiff's § 1983 claim is the three-year period established by the Massachusetts statute for personal injury actions. *Wade*, 460 F.Supp.2d at 233. The lingering issue is when this three-year statute of limitations began to accrue. As a matter of federal law, accrual started when Wade "kn[ew] or had reason to know, of the injury on which [his] action is based." *McIntosh v. Antonino*, 71 F.3d 29, 34 (1st Cir.1995) (quoting *Rivera–Muriente v. Agosto–Alicea*, 959 F.2d 349, 353 (1st Cir.1992)) (internal quotation marks omitted). I previously suggested four possibilities for the date on which the statute began to run:

> 1) The date of Wade's conviction (Sept. 8, 1997); 2) the date Wade first asked for access to [the DNA samples] (Aug. 21, 2002); 3) the denial of this request by either the superior court (July 29, 2003) or the SJC (April 12, 2004); or 4) the time at which the constitutional dimension of his injury, and therefore the reason to know that his injury was actionable, became clear (uncertain).

460 F.Supp.2d at 234.

The defendants argue a fifth possibility, that the statute began to run on August 25, 1997, when the Supreme Judicial Court first deemed DNA test results admissible at trial. *See Rosier*, 425 Mass. 807, 685 N.E.2d 739. As of that date, Wade could have made use of DNA testing and yet had not received access to the biological evidence. It is an awkward formulation, to be sure. In selecting this date, defendants define the rights violation as Wade's simply *lacking access* to the biological evidence, rather than his being actively *denied* that access. Such an interpretation would make sense if the law at the time

provided that the government had an affirmative duty to turn over evidence for testing even absent a request by the defendant. No court has framed the due process right in this way. In any case, the SJC made its landmark ruling only one week before Wade's trial began. It is implausible that in sanctioning the use of DNA evidence at trial, the high court simultaneously created an entitlement to access biological evidence for testing.

Moreover, there is no limitations period during which a person convicted of a crime may *request* access to evidence. Certainly, no federal case or statute establishes a deadline by which a prisoner must request access to post-conviction DNA evidence in order to avoid forfeiting the right to such evidence. Although the Innocence Protection Act, 18 U.S.C. § 3600(a), sets forth a limitations period, this statute applies only to prisoners convicted of federal crimes. Nor is there any state law on point. On the state level, forty-four states have statutes regulating post-conviction DNA access. Massachusetts, however, is one of the six that do not. Without any express limitations, either in statutory or case law, I will not infer a requirement that prisoners must approach the government within any defined period of time.

Wade's argument for the third option—the date his request for access to the evidence was first denied by a court, July 29, 2003—is more compelling. The logic is straightforward: Due Process confers on certain defendants the right of post-conviction access to evidence for DNA testing; that right is not violated until the government actively refuses to comply with it.

■ Two courts confronting the statute of limitations issue have recently applied this reasoning. In *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir.2006), the court found that the proper accrual date for plaintiff's § 1983 claim for DNA testing

was the "date on which the Illinois circuit court denied his request for DNA testing under Illinois law." In *Moore v. Lockyer*, No. 04–1952, 2005 WL 2334350, at *1 (N.D.Cal. Sept. 23, 2005), the court held that California's one-year statute of limitations, absent any tolling, would bar the § 1983 action of a plaintiff who had sought and been denied DNA testing ten years prior.[3] To be sure, this approach assumes that due process confers a right to access evidence *upon request*. But this is precisely the case in the pretrial context: under *Brady v. Maryland*, prosecutors must turn over potentially exculpatory evidence, but only if the accused has made at least a general request for it. *See* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This is sensible: If a violation materialized as soon as a prisoner both merited access to evidence for testing and yet did not have it, the government would be in breach of the Constitution without acting—indeed, without knowing the defendant desired said access.

I pause to explore one caveat: A rule that starts the running of the statute upon the denial of a defendant's post-conviction request links the limitations period to whatever time the defendant selects, at his convenience, for vindication of his rights. *See Wade*, 460 F.Supp.2d at 235 n. 17 (flagging this potential problem). And yet there is little danger in this position. Prisoners who claim to be wrongfully convicted have no incentive to sit on their rights. To the extent that they do so, their delay is likely due to ignorance of those rights, lack of access to legal counsel, and insufficient facility with the legal process.

I note that at least one court identified August 27, 2001—the date on which a federal court first recognized the existence of a constitutional right to post-conviction DNA testing, *see Godschalk v. Montgom-*

*ery County Dist. Attorney's Office*, 177 F.Supp.2d 366 (E.D.Pa.2001)—as the date triggering the statute of limitations. *McKithen v. Brown*, 565 F.Supp.2d 440 (E.D.N.Y. July 21, 2008). In so doing, however, the *McKithen* court was not motivated by a fear that prisoners could pick their own accrual dates. That case involved a defendant who sought and was denied access for testing *before* the *Godschalk* decision. *See id.* at 450 (assuming that the plaintiff sustained his injury in 1996). The court applied the later date in recognition of the fact that though the prisoner may have sustained his injury outside of the limitations period, he did not have reason to know that it was actionable until 2001 at the earliest.

The instant case is like *Derrickson v. Del. County Dist. Attorney's Office*, No. 04–1569, 2006 WL 2135854 (E.D.Pa. July 26, 2006). In that case, a man convicted of murder sought to subject the clothes worn by the victim to DNA testing. He asked the District Attorney's office for access to the clothing in March 2004, *after* the *Godschalk* decision had been issued. The court held that his due process claim for denial of access accrued "when he received the letter denying him access to the clothing evidence." *Id.* at *7.

■ The same logic applies here. Wade's claim accrued when the state prosecutors refused to turn over the vaginal swab, slides, and pants swatch for testing. This apparently occurred some time· in 2002, though precisely when is not clear. *See* Am. Compl. ¶ 2 (document # 36) (noting that the district attorney's office told Wade's counsel that it "would not look for the evidence without a court order"). At the very latest, Wade's injury traces back to the superior court's denial of his motion

---

**3.** The court went on to apply the doctrine of equitable tolling, holding that the claim was

not time-barred. *Moore*, 2005 WL 2334350, at *6.

for access on July 29, 2003. The uncertainty as between the two dates is immaterial. Wade stated a claim under § 1983 on October 11, 2005, and I have already held that it relates back to his habeas petition of October 8, 2004, *see Wade,* 460 F.Supp.2d at 234 n. 13—well within three years of any date on which Wade may have first approached the state prosecutors.

Since I hold that Wade stated his claim within the applicable statute of limitations, I need not address his sundry alternative arguments for timeliness, including the applicability of the Innocence Protection Act, the doctrine of laches as the exclusive timeliness limitation, the doctrine of continuing violations, and equitable tolling.

### C. *Nature of the Due Process Violation*

In my 2006 Order, I left open the threshold question of "what specific standards should be applied to determine when testing should be ordered." *Wade,* 460 F.Supp.2d at 249. I acknowledged that "in cases where an exclusionary test result would have no impact on the earlier verdict, plaintiff would not have a right to testing," but I also recognized that "where an exclusionary test result would automatically exonerate a prisoner, the right is clearly implicated." *Id.* at 231 n. 6. The issue is now squarely before me: at what point between these poles does the right lie?

Wade argues that a prisoner has a substantive due process right to post-conviction DNA testing when "the evidence he wishes to test has the potential to produce results which could raise serious doubts about his original verdict." Pet.'s Mem. Supp. Summ. J. at 29–30 (document # 58) (quoting language from my 2006 Order) (internal quotation marks omitted). He appends three rules to this standard: First, the Court must assume the testing

will produce exculpatory results; second, the Court must disregard the strength of the state's case against the defendant; and third, the Court may not consider any statements or actions of the defendant (e.g., a confession) or his counsel (e.g., poor trial strategy), if these weigh against ordering the tests.

I agree with the first rule—that a court evaluating a claim for access to evidence should assume that testing will produce exculpatory information. To date, 235 people have been exonerated by DNA testing in the United States. *The Innocence Project,* www.innocenceproject.org/about/Mission -Statement.php (last visited Apr. 21, 2009); *see also* Brandon L. Garrett, *Judging Innocence,* 108 Colum. L.Rev. 55, 57 (2008) (discussing the impact of DNA evidence on post-conviction relief). In light of this record, judicial guesswork as to the likely results of testing creates a "significant and needless risk of erroneous deprivation." *McKithen,* 565 F.Supp.2d at 483 (noting the "proven fallibility" of courts in assessing the likelihood that a given defendant has a legitimate innocence claim and courts' tendency to "greatly overestimate[ ] the strength of the government's evidence"). Moreover, the drawbacks to such an assumption are minimal, as a § 1983 plaintiff does not ask the court to vacate his conviction; there must be favorable test results before any significant costs are imposed on the judicial system.

Wade's other two rules, however, create a far too expansive test. If a court must not only assume exculpatory results, but also disregard the government's case against the defendant, however strong, and ignore any self-incriminating statements and actions, it will scarcely encounter an ineligible inmate.

The defendants offer a substantially more demanding standard. They point to the Innocence Protection Act, 18 U.S.C.

§ 3600(a), which, though it applies to prisoners serving a sentence on a federal conviction, as a model. To qualify for testing under the Act, a prisoner must show that he never previously waived his right to request DNA testing of the sought-after evidence, identify a theory of defense that is not inconsistent with any affirmative defense asserted at trial and that establishes actual innocence, and show that DNA testing of the requested evidence would raise a reasonable probability that the applicant did not commit the offense. *Id.* Defendants add to these requirements a call for "independent corroboration of the Plaintiff's claim of actual innocence in the form of credible, admissible evidence." Def.'s Opp. Mem. at 32–36 (document # 66).

This proposed standard reflects the factors that the government considers most salient: The public's substantial interest in the finality of convictions and the uncertainty of whether testing will reveal exculpatory information in any given case. The problem is that it subordinates all other social goods to finality. But as I noted previously, the public is not served by a final conviction rendered suspect by the real possibility of error; nor do victims have any interest in imprisoning the wrong person. *Wade,* 460 F.Supp.2d at 249. The demand for corroborating evidence, meanwhile, could unfairly squeeze out those with colorable claims of innocence who nonetheless have no other objective proof to advance.

The parties have thus situated themselves at the extremes. A more workable standard would weigh the presumption that testing will yield exculpatory results against the reality that the inmate was convicted even in part on the basis of an inculpatory record. It might discount incriminating evidence, but only case-by-case and where supported by experience and logic. *See, e.g., Osborne v. Dist. Attorney's Office for the Third Judicial Dist.,* 521 F.3d 1118, 1133–34 (9th Cir.2008) (declining to hold that defendant's confession precluded his claim for testing, given "the emerging reality of wrongful convictions based on false confessions").

Other courts have already attempted to articulate such a standard. In *Godschalk,* a man convicted of committing two rapes brought suit under § 1983 for access to rape kit evidence collected from both victims for DNA testing to support his innocence claim. Applying the standard fashioned in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the district court held that the plaintiff was entitled to access the evidence if there was "a reasonable probability that had DNA evidence which showed plaintiff was not the source of the genetic material found on the victims been disclosed to the defense, the result would have been different." 177 F.Supp.2d at 370.

In *Osborne,* the Ninth Circuit analyzed the appropriate standard in more detail. The court held that a man convicted of kidnapping and sexual assault had a due process right to access and subject to DNA testing a condom found at the scene of the crime.[4] 521 F.3d at 1141–42. The plaintiff sought testing in order to bring a freestanding innocence claim on habeas review,[5] a claim that would win him relief

---

**4.** The Supreme Court granted certiorari in *Osborne* on November 3, 2008, and heard oral argument on March 2, 2009. *See Dist. Attorney's Office for the Third Judicial Dist. v. Osborne,* No. 08–6.

**5.** The Supreme Court has never held that a claim of true innocence is independently actionable on habeas review in the absence of any alleged trial defect. In *Herrera v. Collins,* Chief Justice Rehnquist wrote for the majority that " 'actual innocence' is not itself a consti-

under Ninth Circuit law only if he could "affirmatively prove that he is probably innocent." *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir.1997). Accordingly, the government argued that to prevail in his § 1983 suit for access to the evidence, he was required to prove that the testing results, if favorable to him, *would* allow him to make the "probably innocent" showing. The court explicitly rejected this standard, holding that "requiring Osborne to demonstrate that he would be entitled to habeas relief if the test results are favorable in order even to conduct such testing is fundamentally inconsistent with *Brady*." 521 F.3d at 1132.

According to the court in *Osborne*, Brady's pretrial disclosure right—upon whose underlying principles I based my 2006 Order and upon which the Ninth Circuit likewise found a due process right to exist—is triggered not when the evidence in question "would or even probably would" allow the defendant to prevail at trial, but rather when it would create "a 'reasonable probability' of a more favorable result at trial." *Id.* at 1133 (emphases omitted). The *Osborne* court held that the disclosure standard should be at least as permissive in the post-trial context. Concluding that the plaintiff's case was so strong that "[w]herever the bar is, he crosses it," the court defined the standard of materiality triggering the right as "no higher than a reasonable probability that, if exculpatory DNA evidence were disclosed to Osborne, he could prevail in an action for post-conviction relief." *Id.* at 1134.[6]

■ The significance of the *Osborne* test was that it was forward looking: It took into account what the next step would be in the criminal process. In *Osborne* the next step was a freestanding innocence claim. In that context, the court held that Osborne could prevail in his § 1983 claim by establishing a reasonable probability-significantly, *less than a preponderance of the evidence*—that, if the evidence turned

---

tutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). He explained that the proper course for an innocent defendant convicted in an error-free trial is to seek executive clemency. *Id.* at 417, 113 S.Ct. 853. Justice Ginsburg, joined by Justice Kennedy, wrote in a concurrence that "the execution of a legally and factually innocent person would be a constitutionally intolerable event." *Id.* at 419, 113 S.Ct. 853 (Ginsburg, J., concurring). She interpreted the majority's opinion as assuming "that a truly persuasive demonstration of actual innocence would render any such execution unconstitutional." *Id.* at 427, 113 S.Ct. 853. The Court has not since formally adopted, let alone clarified, this "truly persuasive demonstration" standard. The Ninth Circuit went further in *Carriger*, holding that the contemplated *Herrera* standard at least required a petitioner to "affirmatively prove that he is probably innocent." 132 F.3d at 476.

Wade has indicated that he intends to advance a freestanding innocence claim in the future. Because he has also asserted trial defects and intends to use his innocence claim as a means of overcoming procedural default, and because the § 1983 suit may be resolved with reference to those trial defects, I need not assess the likely success of his freestanding claim here.

**6.** In yet another case, *Moore v. Lockyer*, the district court followed largely the same analysis. There, a man sought access to a victim's clothing and rape kit to challenge his conviction for rape. The court cited *Bagley* as a good guide for what the standard would likely be: "a criminal defendant's right to access evidence in the state's possession is conditioned upon the defendant's ability to prove that there is a 'reasonable probability' that disclosure of that evidence would affect the outcome of the proceedings." 2005 WL 2334350, at *9. As the court then dismissed the man's suit based on issue preclusion, finding that a state court had already held that the prisoner failed to raise a reasonable probability that the verdict would have been different, it declined to treat the issue in any greater depth.

out to be exculpatory, the prisoner could show that he was probably factually innocent of the kidnapping and sexual assault. *Id.* Likewise, where, as here, the next step is a habeas proceeding with a potential procedural bar, the standard would take into account the likely impact of DNA testing to lift that bar. In both instances the general standard would be: A prisoner has a Due Process right to access biological evidence for DNA testing where there is a reasonable probability that the testing would, if favorable, allow him to prevail in his action for post-conviction relief.

I agree that the appropriate standard is the *Osborne* standard.[7] It is capacious enough to ensure that a court carefully considers the countervailing interests discussed above. By taking into account the substantive showing a prisoner will have to make in his next proceeding, it requires courts to consider the incriminating evidence in the record. It respects the finality of convictions and conserves judicial resources by ordering testing only for prisoners with a real chance at challenging their convictions. At the same time, it leaves courts the discretion to discount evidence of questionable reliability and does not demand of prisoners an unrealistically burdensome ex ante showing of probable innocence.

### D. *Wade's Entitlement to Access the Evidence*

The parties have filed cross-motions for summary judgment. If there is no genuine issue as to any material fact and one party is entitled to judgment as a matter of law, judgment shall enter for that party. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986). In making this determination, a court can look to the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Rule 56(c).

Assuming the DNA testing produces exculpatory results, Wade intends to refile his habeas petition for relief based on ineffective assistance of trial counsel and other trial defects. His claim, however, was procedurally defaulted due to his failure to raise it in his state court proceedings. Thus, Wade will not succeed in his next proceeding unless he can (1) meet the standard for actual innocence to overcome procedural default, and (2) establish a claim for ineffective assistance of counsel. Accordingly, due process entitles him to access the evidence in question only if the DNA tests, if exculpatory, would make it reasonably probable that he could make both showings.

 Where a state prisoner has procedurally defaulted a claim by failing to raise it in state court, federal habeas review of that claim is barred unless he can demonstrate cause for the default and prejudice from the alleged violation, "or demonstrate that the failure to consider the claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see also Wainwright v. Sykes*, 433 U.S. 72, 87–88, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The conviction of one who is actually innocent is one such miscarriage of justice. *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Smith v. Murray*, 477 U.S. 527, 537, 106 S.Ct. 2661, 91 L.Ed.2d

---

**7.** Indeed, the standard perhaps should be broadened to cover other instances in which DNA testing should be ordered. A plaintiff may seek to use DNA testing, for example, to mount a claim for executive clemency. In that case, the myriad procedural hurdles that would confront him on a habeas filing would not be relevant. Because Wade meets the standard articulated here, I need not determine whether a prisoner with a less compelling case would also be entitled to DNA testing.

434 (1986). To establish "actual innocence" of a crime such that consideration of otherwise defaulted claims is warranted, a petitioner must show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) [8]; *Walker v. Russo*, 506 F.3d 19 (1st Cir.2007); *Gunter v. Maloney*, 291 F.3d 74 (1st Cir.2002). In this context, a reasonable juror is one who "would consider fairly all of the evidence presented" and who "would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." *Schlup*, 513 U.S. at 329, 115 S.Ct. 851. On the unique facts of this case, exculpatory DNA evidence would make it reasonably probable that Wade could meet this burden.

■ While circumstantial evidence suggests that Wade beat or otherwise abused his employer's mother, who later died in the hospital, the Commonwealth did not indict him for intentional murder. To do so would have required it to prove a mens rea of deliberate premeditation or extreme atrocity. Mass. Gen. Laws ch. 265, § 1. Rather, the Commonwealth charged and a jury convicted Wade of felony murder, the underlying felony being aggravated rape. Any doubt cast upon the rape charge casts doubt on the murder conviction. If DNA testing tends to exclude Wade as the rapist, then it necessarily makes it more likely than not that a reasonable juror *would* have had a reasonable doubt as to Wade's involvement in the crime charged. Indeed, this effect would be even stronger if the testing leads police to a known individual.

This bears emphasizing: Because actual innocence is a legal concept with reference to the elements of the crime charged—here, felony murder—as opposed to a showing of noninvolvement in criminal conduct at all, DNA tests that fail to connect Wade to the vaginal swab, semen slide, bloody pant swatch, or fingernail scrapings would undoubtedly make it reasonably probable that he could overcome the doctrine of procedural default.

Of course, I must consider the balance of the evidence incriminating Wade for the rape. The employer's mother was found naked and injured in his bedroom. Wade, also naked, was found in the room with her. According to the employer, Wade stated upon being discovered, "she came to me," and shortly thereafter to the mother, "see all the trouble you got me into." The victim is said to have identified Wade as her attacker to an investigating officer at the hospital. Finally, the serologist could not exclude him as a source of the semen discovered on her pants.

Other courts have proven willing to order testing even in the face of substantial evidence of guilt. In *Godschalk*, the court identified a number of hurdles for the prisoner: He had given a voluntary, detailed confession; the amount of material collected from one victim was too small to be tested; and the other victim had had sex with her fiancé the night before the rape, complicating the sample taken from her. Nevertheless, it granted the plaintiff's motion on the "chance[,] no matter how remote," that testing might exclude him as a source of the genetic material. *Id.* at 370. The court explained that in that case, "a jury would have to weigh this result against plaintiff's uncoerced detailed confessions to the rapes." *Id.*

The *Osborne* court was moved by a similar rationale. It determined that Os-

---

**8.** In *Schlup*, the majority expressly rejected the dissent's proposal that the showing be made by clear and convincing evidence—the actual innocence standard for challenges to sentences articulated in *Sawyer v. Whitley*, 505 U.S. 333, 336, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).

borne's confession to the sexual assault he was convicted of, as well as eye-witness identifications used against him, did not foreclose his right to post-conviction DNA testing. 521 F.3d at 1140. The court reasoned that the question is not "how much weight [the court] should afford Osborne's confessions standing alone, but how they might be squared with exculpatory DNA tests and the remainder of the evidentiary record." *Id.*

This approach makes sense.[9] It declines to short-circuit the balancing of evidence before the full exculpatory nature of the DNA testing is known. Further, it allows recent insights into the fallibility of certain types of evidence to enter into the analysis. *See, e.g.,* Garrett, *supra,* at 88–89 (finding that 31 of 200 exonerations involved confessions or self-incriminating statements); Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post–DNA World,* 82 N.C. L.Rev. 891 (2004) (drawing on the literature of social psychology to explain false confessions); *Kansas v. Marsh,* 548 U.S. 163, 210, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006) (Souter, J., dissenting) (acknowledging that most wrongful convictions have "resulted from eyewitness misidentification, false confession, and (most frequently) perjury").

To be sure, such an approach means that those convicted of rape will have a particularly compelling case for DNA testing. But this too is as it should be. Rape is a crime for which both conviction and exoneration often depend on biological evidence susceptible to scientific verification.

*See* Garrett, *supra,* at 73 (141 of 200 exonerees studied had been convicted of rape). Given the significant potential here that favorable testing results will raise doubt about the rape and thus the murder conviction—as well as the fact that Wade has always maintained his innocence and that he cannot be the source of the A antigens found on the victim's clothing—he appears to meet the legal standard for entitlement to the due process right.

As to Wade's substantive claim on habeas relief: While exculpatory test results would save Wade from procedural default, testing will not be due unless his success on the merits of that action—here, based on ineffective assistance of counsel—is also reasonably probable. Wade's claim is strong enough to meet this standard. His argument on habeas review will be that his trial attorney's performance was deficient and that that deficiency was prejudicial to him. *See Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Specifically, Wade intends to argue that trial counsel's decision to mount a defense of consent was deficient and harmful to him. In light of the fact that the victim suffered from Alzheimer's Disease, she may not have been able to consent. *See Commonwealth v. Blache,* 450 Mass. 583, 584, 880 N.E.2d 736 (2008) (proof that a person lacks the capacity to consent can defeat a consent defense to rape). Wade also intends to argue his trial attorney's failure to seek DNA testing as evidence of ineffective assistance. On this record, I cannot say that these theories do not have a reasonable probability of succeeding.[10]

---

**9.** Indeed, the DNA testing ordered in *Godschalk* led to the plaintiff's exoneration. *See* Sara Rimer, *DNA Testing in Rape Case Frees Prisoner After 15 Years,* N.Y. Times, Feb. 15, 2002, at A12. A stricter view on the basis of his confession would have resulted in the continued confinement of an innocent man who had already spent fifteen years in prison.

**10.** I further note that at this point, I do not expect Wade to encounter a successive habeas bar under 28 U.S.C. § 2244. In my order granting respondent's motion to dismiss the initial petition, I explained that Wade's petition was time-barred because the one-year limit for filing under § 2244(d) had run and Wade had not made a showing of "actual

## V. CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment (document # 57) is **GRANTED.** Defendants' cross-motion for summary judgment (document # 65) is **DENIED.** The defendants are hereby ordered to provide Wade the items he seeks to subject to DNA analysis.[11]

**SO ORDERED.**

innocence" to warrant equitable tolling. *See* Mem. & Order of Sept. 26, 2005, at 2 (document # 35). At the same time, I granted Wade's motion to amend so that he could pursue access to the biological evidence through § 1983. If the DNA testing ordered here produces exculpatory results, there is a reasonable probability that he will satisfy the actual innocence barrier and be able to have his habeas claims adjudicated by a federal court on the merits for the first time. *Cf. Slack v. McDaniel*, 529 U.S. 473, 485–86, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (holding that "a habeas petition filed in the district court after an initial habeas petition was unadjudicated and dismissed for failure to exhaust state remedies is not a second or successive petition"); *Stewart v. Martinez–Villareal*, 523 U.S. 637, 645, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998) (holding that a death row inmate's motion to reopen the competency claim raised in his initial habeas petition, which was dismissed without prejudice as premature because he had not yet received his warrant of execution, should not be denied as successive because that approach "would mean that a dismissal of a first habeas petition for technical procedural reasons would bar the prisoner from ever obtaining federal habeas review").

11. In his amended complaint, Wade raised several other constitutional theories to support his claim for access to the biological evidence, including procedural due process, freestanding actual innocence, confrontation and compulsory process, cruel and unusual punishment, and the right to pursue clemency. These were not litigated at the motion to dismiss stage, and neither party seeks summary judgment on them now. Because my ruling resolves the § 1983 claim on the basis of the due process right I recognized in my 2006 Order, I need not address these alternatives.